AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

FILED

DEC 18 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

MAG

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| CINTHIA MIRAMONTES RODRIGUEZ, a/k/a "Cynthia Rodriguez," a/k/a "Cynthia Rodriguez Navarro," AND BRAYAN JOSIAS LOPEZ TORRES | ) ) ) ) ) | Case No.  3  19  72046 |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of December 17, 2019 in the county of Alameda in the Northern District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) | Possession with Intent to Distribute Controlled Substances |

This criminal complaint is based on these facts:

See attached Affidavit of DEA Special Agent Joseph A. Pittaluga.

☒ Continued on the attached sheet.

Approved as to form _____
AUSA Sailaja M. Paidipaty

*Complainant's signature*

Joseph A. Pittaluga, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/18/2019

*Judge's signature*

City and state: San Francisco, California

Hon. Thomas S. Hixson, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Joseph A. Pittaluga, a Special Agent of the Drug Enforcement Administration (DEA), being sworn, hereby declare as follows:

### INTRODUCTION

1. I submit this Affidavit in support of an application for a criminal complaint charging CINTHIA MIRAMONTES RODRIGUEZ a/k/a "Cynthia Rodriguez" or "Cynthia Rodriguez Navarro" and BRAYAN JOSIAS LOPEZ TORRES with a violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (possession with intent to distribute controlled substances).

2. The statements in this Affidavit are based on my own investigation; information from other law enforcement agents, investigators, and individuals with knowledge of this matter; my review of documents related to this investigation; and my training and experience as a DEA Special Agent. This Affidavit does not purport to set forth all of the evidence gathered to date in this investigation, or to name all of the persons who participated in these crimes; I have included only those facts that I believe are necessary to establish probable cause for the requested criminal complaint and arrest warrant.

### RELEVANT STATUTES

3. Under 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), it is unlawful for a person to knowingly or intentionally manufacture, distribute, or possess with intent to distribute, controlled substances, including a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenyl-ethyl)-4-piperidinyl] propanamide, also known as fentanyl.

### BACKGROUND OF INVESTIGATING AGENT

4. I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA"). I have held this position since August 2016. I investigate drug trafficking organizations as a member of the DEA, San Francisco Field Division, Oakland Resident Office. Before working with the DEA, I was a sworn law enforcement officer with the St. Petersburg Police Department in St. Petersburg, Florida, for approximately eleven years. For approximately eight of those years, I was a detective in the Narcotics Division.

5. I received twenty weeks of specialized drug law enforcement training at the DEA training academy in Quantico, Virginia, from September of 2016 to February of 2017. This training covered all aspects of drug investigations, including identification of controlled substances, physical and electronic surveillance, utilization of confidential sources, interview techniques, undercover operations, financial investigations, money laundering techniques, and the general operation of drug trafficking organizations.

6. During my law enforcement career, I have participated in hundreds of investigations of illicit drug traffickers, including complex conspiracies. These investigations have involved the use of undercover officers, confidential informants, physical surveillance, and investigative interviews, which have led to the execution of search warrants and arrest warrants at both the state and federal level. I have executed hundreds of warrants ordering the search of locations for controlled substances, related paraphernalia, firearms, and other evidence of state and/or federal narcotics offenses. I have participated in multiple wire investigations at the state and federal level. I have been actively involved as the case investigator in state and federal investigations and have spoken with multiple confidential informants involved in drug trafficking. I have served as the affiant for state and federal search warrants related to investigations of narcotics trafficking offenses. My work in these areas has resulted in arrests and convictions of numerous offenders at the state and federal level, seizures of bulk narcotics, narcotic supplies, and assets.

7. While working in an undercover capacity, I have purchased crystal methamphetamine, heroin, cocaine base, cocaine powder, prescription medications, MDMA, and marijuana. I have participated in, planned, and/or supervised physical surveillance and electronic surveillance in multiple investigations. I have interviewed multiple defendants and multiple informants who have participated in the trafficking of methamphetamine and/or cocaine by Mexican drug trafficking organizations ("DTOs").

8. From my participation in these and other activities, I have gained particular knowledge in the use and utility of undercover agents, confidential informants, physical

surveillance, wire surveillance, electronic surveillance, consensual recordings, investigative interviews, mail covers, trash searches, installation and monitoring of GPS tracking devices, pole-mounted cameras, and the execution of search warrants. I have analyzed information from traditional record sources, such as telephone toll and subscriber records, as well as non-traditional record sources, such as the informal ledgers routinely maintained by drug traffickers listing amounts of drugs received from sources and distributed to customers and the amounts of money received from customers and owed to sources. Additionally, I have spoken with experienced law enforcement officers and cooperating individuals about the ways drug traffickers obtain, prepare, and package drugs, as well as the methods of operation, and security measures employed by drug traffickers.

9. I have also gained expertise in the identification and collection of drug and non-drug evidence, and the analysis and the interpretation of recorded conversations. Specifically, I have participated in more than ten state or federal investigations that employed court-authorized wire interceptions ("wiretaps") in narcotics and/or money laundering investigations. The majority of the wiretap investigations in which I have participated involve organizations trafficking cocaine, heroin, and methamphetamine. During these investigations, I have reviewed hundreds of line sheets (summaries of intercepted conversations) or transcripts (verbatim written accounts of intercepted conversations) of drug-related conversations. I have confirmed the meaning of drug-related intercepted conversations with the targets themselves during post-arrest debriefings.

10. I have conducted hundreds of hours of physical surveillance of individuals suspected of narcotics trafficking who were targets of wiretap interceptions. In doing so, I was able to compare the content of the intercepted conversations with the actual movements and actions of the persons intercepted on wiretaps.

11. Through my classroom and field training, my involvement in drug investigations, conversations I have had with other law enforcement personnel, and interviews I have conducted with informants and defendants involved in narcotics trafficking, I have become familiar with the

methods used by drug traffickers to import, transport, safeguard, and distribute drugs, and to collect, transport, safeguard, remit, and/or launder drug proceeds.

## STATEMENT OF PROBABLE CAUSE

**A.      In January 2019, agents intercepted RODRIGUEZ discussing narcotics trafficking over the phone.**

12.     Since late October 2017, the DEA has been investigating organized criminal networks distributing illegal drugs in the Tenderloin neighborhood of San Francisco, California ("the Tenderloin"). In about June 2018, the DEA began coordinating investigative efforts with the San Francisco Police Department (SFPD) and Richmond Police Department (RPD), which were conducting parallel investigations.

13.     The investigation involved several Court-authorized wiretaps of phones. On January 14, 2019, the Honorable Richard Seeborg, U.S. District Judge for the Northern District of California, authorized the interception of wire and electronic communications over a phone number ending in - 7976 that was used by Isa Cruz, a suspected drug trafficker. *See* 19-90449 MISC RS. Interceptions began on January 15, 2019 and ended on February 12, 2019.

14.     On January 18, 2019, at approximately 6:40 p.m., agents intercepted a call between Cruz and RODRIGUEZ. An excerpt of the call, which has been translated from Spanish, follows:

| | |
|---|---|
| CRUZ: | Um, listen, someone told me that you could help me find some of the white work. |
| RODRIGUEZ: | Uh-huh |
| CRUZ: | And it's just that, I haven't had any work for three days now, and I wanted to see if you could help me with that, if you had some, or…mhm |
| RODRIGUEZ: | Look, I have some, but it's just that you wanted it for right now, right? |
| | [. . .] |

| | |
|---|---|
| CRUZ: | Oh, alright, then, ask, to see, and yes, I needed a square, and you can let me know the price, and so I can see if I can get it. |
| RODRIGUEZ: | Honestly… |
| RODRIGUEZ: | How much are you paying for it? |
| CRUZ: | Because they were selling it to me for twenty-six, five hundred. |

15.     Based on my training and experience, I know that drug dealers often use coded language when referring to drugs. "Work" is a common word used by narcotics traffickers to mean "drugs." This is because to anyone listening to the conversation, it will simply sound as if the person is looking for legitimate work, and not illegal narcotics (and selling drugs is their "work"). I further know that "white" is a common reference to cocaine because cocaine is white in color. Finally, I know based on my training and experience, knowledge of this investigation, and discussions with other experienced law enforcement investigators that the current price of a kilogram of cocaine in the San Francisco Bay Area is around $26,000-$27,000. Therefore, I believe that in this conversation, Cruz asked whether RODRIGUEZ could help her obtain a kilogram of cocaine ("white work") and that Cruz typically paid approximately $26,500 for that quantity of drugs in the past.

16.     Approximately 12 minutes later, at 6:52 p.m., agents intercepted another call between RODRIGUEZ and Cruz. An excerpt of the conversation that was translated from Spanish follows:

| | |
|---|---|
| RODRIGUEZ | Listen, I called that guy but Isa, that guy has the material very expensive. And that guy knows that they don't have material. |
| CRUZ | Uh-huh. |
| RODRIGUEZ | Uh, I haven't worked with them in a while and they sold it. |
| CRUZ | Uh…how much did he say it was for? |
| | [Voices overlap] |
| RODRIGUEZ | At twenty-eight (28). |
| CRUZ | At twenty-eight (28)? |

| | |
|---|---|
| RODRIGUEZ | Yeah, yeah…at twenty-eight (28). |

17. Based on my training and experience and my review of the prior intercepted calls, I believe that RODRIGUEZ told Cruz that her drug supplier could obtain the cocaine that Cruz requested ("that guy has the material"), but that the price would be $28,000, which is higher than the market average ("very expensive").

18. At the end of the call, Cruz stated, "I'm going to run some numbers and I'm going to…if anything comes up, I'll give you a call."

19. At approximately 6:59 p.m., agents intercepted another call between Cruz and RODRIGUEZ. An excerpt of the conversation that was translated from Spanish follows:

| | |
|---|---|
| CRUZ | Do you think it can be done today, Cinthia? |
| RODRIGUEZ | Yes…Yes. That [unintelligible] is close by here. |
| […] | |
| RODRIGUEZ | I was going to ask, if you trust me… |
| CRUZ | Uh-huh. |
| RODRIGUEZ | You can bring the money to the house and I will go get it, where I have to go get it. You – |
| [Voices overlap] | |
| CRUZ | Uh-huh |
| RODRIGUEZ | Bring it over here where I live here. |
| CRUZ | Oh, okay. That's fine. So then I would go all the way to your house? |
| RODRIGUEZ | Yes… |

20. Based on my training and experience, knowledge of this investigation, and my review of the prior intercepted calls, I believe that in this call RODRIGUEZ said she would be able to obtain the cocaine that day. RODRIGUEZ instructed Cruz to bring the money to her house and then RODRIGUEZ would go get the drugs.

21. At approximately 7:58 p.m. and then again at 8:02 p.m., agents intercepted

additional calls between RODRIGUEZ and Cruz, during which RODRIGUEZ provided Cruz with an address and directions. Based on my review of the prior intercepted calls, I believe RODRIGUEZ gave Cruz her home address so they could complete the drug transaction.

> **B.  In July 2019, a federal grand jury indicted RODRIGUEZ with one count of using a communication facility to facilitate drug trafficking.**

22. On July 25, 2019, a federal grand jury returned an indictment charging Cruz, RODRIGUEZ, and three other defendants with charges relating to drug trafficking. RODRIGUEZ is charged with one count of illegal use of a communication facility to commit, cause, and facilitate the distribution and possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 843(b). *See United States v. Isa Cruz, et al*, No Cr 19-0343 CRB. The Court issued an arrest warrant for RODRIGUEZ based on the indictment.

23. Agents have been unable to locate and apprehend RODRIGUEZ following the issuance of the Indictment.

> **C.  On December 17, 2019, agents stopped RODRIGUEZ and LOPEZ TORRES's car and seized approximately 278 gross grams of suspected fentanyl and $14,000 in cash.**

24. On December 11, 2019, the Honorable Thomas S. Hixson, U.S. Magistrate Judge for the Northern District of California, issued a warrant authorizing the collection of physical location data over a cellular phone ending in –9038. *See* 19-72005 TSH. Agents believed that the phone was being used by a suspected drug dealer (not RODRIGUEZ or LOPEZ TORRES).

25. Based on the physical location data, on December 17, 2019, myself and other agents conducted surveillance in San Leandro in Alameda County. At approximately, 3:10 p.m., I saw RODRIGUEZ leave an apartment building and get into the front passenger's seat of a black Honda Accord. I recognized RODRIGUEZ from a prior booking photo that I had reviewed.

26. I and other agents followed the car. After taking a right-hand turn, the car hit a nearby curb. At that time, DEA Special Agent (SA) Andrew Decker turned on the emergency lights of his vehicle to initiate a traffic stop. The driver of the car attempted to pull off the curb

and drive away. To prevent that, I blocked the car with my vehicle.

27. SA Decker instructed the driver, who was later identified through a Honduran identification card as LOPEZ TORRES, to turn off the car.

28. I contacted RODRIGUEZ and placed her in handcuffs.

29. SA Decker saw an open bag on the driver's-side floorboard near LOPEZ TORRES's legs that contained a vacuum-sealed package containing a white substance. Believing that the bag contained drugs, SA Decker removed LOPEZ TORRES from the car.

30. Inside the bag was one vacuum-sealed package containing a white material, a twist-lock baggie containing a white material, and a ziplock baggie containing a white material. Also inside the larger bag, agents found approximately $14,000 in cash and a digital scale that was coated in a white powder residue. Based on my training and experience, I know that drugs are sold by weight and therefore scales are often used by drug dealers to weigh their drugs for sale.

31. Because of the recent prevalence of drug seizures involving fentanyl, myself and other agents have received training regarding identifying and handling fentanyl. Based on my training and experience, I know that fentanyl is a particularly potent drug that can cause a "contact high" or "contact overdose," meaning that even if an individual is not using the drug, merely being exposed to the drug can result in serious physical effects. I also know that fentanyl can be a white powder. Out of concern for our safety, SA Decker asked LOPEZ TORRES if any of the drugs in the bag contained fentanyl. LOPEZ TORRES replied that each of the three packages in the bag contained fentanyl.

32. The suspected fentanyl from the car was seized and processed according to protocols specific to the preservation of fentanyl. In total, the three packages weighed approximately 278 gross grams.

//
//
//

## CONCLUSION

33. I believe based on the foregoing facts that there is probable cause to believe that CINTHIA MIRAMONTES RODRIGUEZ a/k/a "Cynthia Rodriguez" or "Cynthia Rodriguez Navarro" and BRAYAN JOSIAS LOPEZ TORRES have violated 21 U.S.C. § 841(a)(1) and 841(b)(1)(C) (possession with intent to distribute a controlled substance).

I declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief.

Joseph A. Pittaluga
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on December 16, 2019.

HONORABLE THOMAS S. HIXSON
United States Magistrate Judge